DECISION
{¶ 1} Relator, Luke M. Miler, has commenced this original action in mandamus requesting this court to issue a writ ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this case was referred to a magistrate of this court to conduct appropriate proceedings. The magistrate has rendered a decision, including findings of fact and conclusions of law, which is attached hereto as "Appendix A". In that decision, the magistrate found that the medical reports of Dr. Cunningham are not internally inconsistent and that Dr. Hoover's report need not be excluded from evidentiary consideration. Moreover, the magistrate concluded that Dr. Hoover's report constituted some evidence upon which the commission could rely. Therefore, the magistrate has recommended that we deny the requested writ of mandamus.
 {¶ 3} No objections have been filed to the magistrate's decision.
 {¶ 4} Finding no error or other defect on the face of the magistrate's decision, and pursuant to Civ.R. 53(C), we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, the requested writ of mandamus is denied.
Writ of mandamus denied.
Brown and McCormac, JJ., concur.
McCormac, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Luke M. Miler, : Relator, : v. : No. 03AP-854 Industrial Commission of Ohio and : (REGULAR CALENDAR) Grismer Tire Company of Lima, Inc., : Respondents. :
 MAGISTRATE'S DECISION Rendered on March 25, 2004 Gallon Takacs Co., L.P.A., and Theodore A. Bowman, for relator.
Jim Petro, Attorney General, and Phil Wright, Jr., for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 5} In this original action, relator, Luke M. Miler, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 6} 1. Relator has sustained two industrial injuries while employed as a service manager/tire technician at a tire repair/replacement shop. His May 8, 1997 injury is allowed for "sprain of pelvis, bilateral groin; right inguinal hernia," and is assigned claim number 97-386927. His January 22, 1999 injury is allowed for "sprain of neck; de-pressive disorder NOS; herniated nucleus pulposus T2-T3," and is assigned claim number 99-314322.
 {¶ 7} 2. On November 14, 2002, relator filed an application for PTD compensation.
 {¶ 8} 3. On January 23, 2003, on the commission's behalf, relator was examined by John W. Cunningham, M.D., for the allowed physical conditions of the two industrial claims. In his narrative report, Dr. Cunningham wrote:
* * * [T]his individual is employable in physical work activity in some medium work. He should not be asked to lift, carry, push, pull or otherwise move objects greater than 30 lbs., and he should not be asked to use his arms above shoulder level except on rare occasions in the course of his employment. * * *
 {¶ 9} 4. On January 23, 2003, Dr. Cunningham also completed a physical strength rating form. The form asks the examining physician to place a mark beside the type of work the claimant can perform. Dr. Cunningham marked the "Medium Work" category. On the form, "Medium Work" is defined:
Medium work means exerting twenty to fifty pounds of force occasionally, and/or ten to twenty-five pounds of force frequently, and/or greater than negligible up to ten pounds of force constantly to move objects. Physical demand require-ments are in excess of those for light work.
 {¶ 10} Dr. Cunningham crossed out the word "fifty" and wrote "30" above it. He also wrote "See Narrative."
 {¶ 11} 5. On January 23, 2003, on behalf of the commission, relator was examined by psychologist Donald J. Tosi, Ph.D. Dr. Tosi examined for the depressive disorder and wrote:
Opinion: The following opinion is based on a reasonable degree of psychological certainty.
Question 1: Has the Claimant reached Maximum MedicalImprovement? The Claimant has reached MMI.
Question 2: What is the percentage of permanent impairmentarising from each of the allowed conditions within yourspeciality in each claim? Utilizing the AMA Guidelines to theEvaluation of Permanent Impairment, 4th Edition, this percent-age is expressed as a whole person impairment, based on the following four residual functioning capacities for the allowed psychological conditions:
Area of Functioning Level of Impairment (Class)
 • Activities of Daily Living II • Sustained Concentration and Memory II • Social Interaction II • Adaptation II • GAF Value 72
 Whole Person Impairment Percentage of Permanent Impairment 18%
 Question 3: What is the Claimant's occupational activitycapacity? The Claimant would be able to return to his former position of employment.
(Emphasis sic.)
 {¶ 12} 6. The commission requested an employability assessment report from psychologist Thomas O. Hoover, Ph.D. The Hoover report, dated March 3, 2003, responds to the following query:
Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed conditions (s), identify occupa-tions which the claimant may reasonably be expected to perform, (A) immediately and/or, (B) following appropriate academic remediation or brief skill training.
 {¶ 13} Indicating acceptance of Dr. Cunningham's report and responding to the above query, Hoover listed employment options. For "[c]urrent options" requiring no skill development or academic remediation, Dr. Hoover listed the following sedentary jobs: "telephone answer serv oper[;] dispatcher, maintenance ser[;] routing clerk[;] yard clerk[;] data-examination clerk[;] service clerk." For options requiring reasonable academic remediation to the seventh or eighth grade levels or minimal on-the-job training, Dr. Hoover listed the following sedentary jobs: "dispatcher, radio[;] production clerk[;] personnel scheduler[;] scheduler, maintenance[;] traffic clerk[;] insurance clerk[;] quality-control inspector[;] credit clerk."
 {¶ 14} Under "IV Employability Assessment Database," Hoover wrote:
B. WORK HISTORY:
Jobs in the U.S. Economy are listed in the Dictionary ofOccupational Titles (DOT). Accordingly, the claimant's work history would be classified as follows:
 Job * * * Skill Strength Dates of Title Level Level Employment
 Service * * * 6 L 1989 — 1999 Manager Mechanic * * * 7 M 1984 — 1988 Service * * * 7 L 1984 — 1988 Manager Cook * * * 2 L 1976 — 1978 Dishwasher * * * 2 M 1976 — 1978
C. EDUCATIONAL HISTORY:
 Highest Grade Completed : 10 Date of Last Attendance : 1976 High School Graduate : No GED : Yes Vocational Training : Not beyond school and work : experience as discussed above. ICO Educational Class : High School Equivalent — GED : DOL= 4
D. TESTED APTITUDES AND ACADEMIC ABIILTIES (USDOL Coded):
No academic achievement test data was available in the claimant's file. Nor were any measures of specific capacities.
E. ADJUSTED WORKER TRAIT PROFILE:
This section presents a summary, coded profile of residual capacities of all relevant types: General Educational Development (GED), Aptitudes, and Temperaments.
This section reflects only data obtained from the claimant's educational history, work history and reflecting the highest levels of functioning.
General Educational Development (GED)
The GED Scale depicts formal and informal education which advances basic Reasoning development, Mathematical development and Language development, those aspects of education which are required of the worker for satisfactory job performance. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States.
Experience or self-study can further improve GED. The corresponding GED Levels presented below are only guidelines.

 Actual Grade Similar The Corresponding
 Grade Level (GED) ICO Educational
 Level By Testing Level Classification And
 USDOL Code To
 Actual Grade Level
 Achieved
 (R) Reasoning 10 No Testing 3 GED judged=H.S.=DOL=4
 (M) Math 10 No Testing 3 GED judged=H.S.=DOL=4
 (L) Language 10 No Testing 3 GED judged=H.S.=DOL=4
 Aptitudes: USDOL Key for Rating Aptitudes:
 Level
 1 S Top 10% of the population — Superior
 2 AA Highest 1/3 exclusive of top 10% — Above Average
 3 A Middle 1/3 of the population — Average
 4 BA Lowest 1/3 exclusive of bottom 10% — Below Average
 5 N Bottom 10% of the population — Minimal Ability
 USDOL
 Aptitudes Demonstrated in Claimant's Work History Rating Level
 (G) Intelligence — general learning ability ............. A 3
 (V) Verbal — understand and use words effectively ....... A 3
 (N) Numerical — understand and perform mathematics ...... A 3
 (S) Spatial — "visualize" objects in 2-3 dimensions ..... AA 2
 (P) Form Perception-perceive/distinguish graphic detail ....... A 3
 (Q) Clerical Perception-distinguish verbal/tabular detail ..... A 3
 (K) Motor Coordination-coordinate eyes, hands, fingers ........ A 3
 (F) Finger Dexterity-finger/manipulate small objects .......... A 3
 (M) Manual Dexterity-handling, placing, turning motions ....... AA 2
 (E) Eye/Hand/Foot Coordination-motor/visual responsiveness .... BA 4
 (C) Color Discrimination-match/discriminate colors ............ BA 4

Temperaments Demonstrated in Claimant's Work History:
Temperaments demonstrated in the work history were not used as limiting factors in the vocational analysis of this claimant, but were presented to provide one basis for understanding past capacity to adapt to situational job demands. The numerical frequency associated with each temperament reflects the percentage of jobs in which that specific temperament may be involved.
 VR — V — Changing tasks often, Varied Duty — 17.60% DR — D — Directing or supervising others — 17.49% JD — J — Making judgments and decisions — 47.28[%] PP — P — Working with, dealing with people — 22.74% TL — T — Doing precise work, tolerances — 54.81% RP — R — Doing repetitive, or short cycle work — 45.98%
F. RATIONAL FOR ADJUSTED WORKER TRAIT PROFILE
(Adjusted RFC):
Vocational Diagnosis and Assessment of Residual Employability Process (VDARE). This process applied the Dictionary ofOccupational Titles as the basis for describing the claimant's work history in terms of how they are described in the United States Economy, Work Adjustment Theory and Documents provided in Section IV.
 {¶ 15} 7. In the meantime, on March 14, 2003, relator underwent a vocational and psychological evaluation performed by psychologist Robert A. MacGuffie, Ph.D. The evaluation was performed at relator's request. The evaluation consisted of a clinical interview and administration of the Wide Range Achievement Test — III and the Beck Inventory. Thereafter, Dr. MacGuffie issued a report, dated April 9, 2003, that was filed with the commission on April 16, 2003. The MacGuffie report states in part:
WIDE RANGE ACHIEVEMENT TEST
The Wide Range Achievement Test (WRAT) measures reading, spelling, arithmetic skills. Scores are provided for each of these subtest areas which can be used to compare the achievement levels of one person to another from kindergarten age to adulthood.
Mr. Miler's performance on the Wide Range Achievement Test shows that his reading and spelling ability was at the third grade level and his arithmetic at the seventh grade level. This profile suggests that he would not be a candidate for retraining.
BECK INVENTORY
The Beck Inventory measures cognitive, affective, somatic, and vegetative symptoms commonly associated with de-pression.
Mr. Miler scored 37 which is indicative of moderate depression.
* * *
The vocational analysis revealed a forty-one year old who has limited specific vocational preparation (less then high school), no transferable skills, who has not worked in four years, has documented physical and psychological impairments at the point of maximum medical improvement and who is not a candidate for retraining.
The medical record suggested that physically Mr. Miler may perform less than the full range of medium work with restrictions. However, the medical record addressing his psychological impairment suggest that Mr. Miler suffers a severe psychiatric disability which prohibits him from per-forming significant remunerative employment. His depression is of such severity that pacing and persistence would be disrupted in work or work-like setting and deterioration and decompensation would occur. Unfortunately, Mr. Miler is permanently and totally disabled.
 {¶ 16} 8. Following a June 24, 2003 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's lengthy order provides an alternative basis for denying the PTD application based upon acceptance of the medical reports of Drs. Cunningham and Tosi and the employability assessment report of Dr. Hoover. After extensively discussing the reports of Dr. Cunningham and Tosi, the SHO's order states:
As a result of the ability to perform at least medium work and the fact that the present condition is not preclusive of sustained renumerative [sic] employment, this Staff Hearing Officer must now consider the vocational factors. This Staff Hearing Officer finds an employment ability [sic] assessment report was completed on behalf of the Industrial Commission by Thomas O. Hoover, PhD. on 03/03/2003. Dr. Hoover submits an excellent employability assessment report and clearly identifies positions of employment that the claimant would be able to perform within his physical and psychological residual capacity and explains the assets the claimant has which could be put toward employment abilities. Specifically, Dr. Hoover finds that the claimant is a young person. He is only 41 years of age. His age would in no way effect his ability to function in the employment environment. In addition, the Injured Worker has many years remaining of work life expectancy with no mandatory retirement age indication. Dr. Hoover indicates the Injured Worker's age in and of itself is not a factor for current job placement consideration. Age is also not a factor for current job placement opportunities in terms of options for which this Injured worker would qualify if academic mediations [sic] (basic reading and arithmetic skills as well as on the job training) would be a requirement to improve his skills to the 6th and 7th grade levels to enter jobs requiring simple entry level sedentary and light work.
The claimant has at least 10 years of formal education. Dr. Hoover indicates that education is primarily used to mean formal schooling or other training which contributes to the ability to meet vocational requirements. Typically the numer-ical grade level is used to represent actual educational abilities unless there is evidence to contradict it. Accordingly, this Injured Worker would be in the educational classification for high school or above which means the 12th grade level or above. The claimant has achieved a G.E.D. and this has been judged to [sic] equivalent to a high school education. Generally[,] an individual with these skills and educational abilities can perform semi-skilled through skilled work. Since the Injured worker has obtained a G.E.D., this is an employment advantage. However, if he didn't obtain a G.E.D. this would not change the jobs listed that he would still currently be able to perform.
The Injured Worker's work history is not necessarily a factor, but it does reflect the limited adaptation to different work experiences and environments. In addition, Dr. Hoover finds the fact that the Injured Worker is receiving Social Security Disability is a disincentive and a motivational issue in regard to his willingness to seek or attempt to engage in standard renumerative [sic] employment. Dr. Hoover indicates the claimant has a work history of unskilled, semi-skilled and skilled jobs and these skills do transfer to light and sedentary work. Dr. Hoover then goes on to indicate that the Injured Worker's work history indicates that he was successfully employed, according to how the job's previously worked are typically completed in our society, this worker had demonstrated an ability to function at the level suggested by academic history, and that the claimant would therefore currently be able to perform entry level tasks required for sedentary or light jobs. Considering past work accomplish-ments and formal education achieved, there is no basis to find incapacity for academic remediation to the 7th and 8th grade level. Further, the claimant has learned semi-skilled work and there is insufficient evidence of any loss of cognitive functioning. Therefore, the Injured Worker can learn new work. The Injured Worker would possibly have some initial difficulty adapting to unfamiliar clerical work since his past work has only been that which would be rated by DOT standards as non-clerical settings. Dr. Hoover goes on to find that it is significant that the Injured Worker perceives himself to be Permanently and Totally Disabled. Dr. Hoover then also points out other federal and state programs which would be of value to the Injured Worker for career counseling, retraining and assistance with job placement. These are programs to which the Injured Worker has not availed himself.
This Staff Hearing Officer finds based upon the physical residual functional capacities of Dr. Cunningham and the functional capacity on a psychological basis by Dr. Tosi, Dr. Hoover has identified several employment options for this individual. Dr. Hoover indicates current options which would include the following occupations in which the claimant is presently employable without any skill developement [sic] or any academic remediations. These positions have been rated by the Department Of Labor as sedentary and work classified as sedentary is about 11% of employment in our society. These positions of employment would be telephone answer service operator; dispatcher, maintenance service; routing clerk; yard clerk; data-examination clerk; and service clerk. Options for which the claimant would qualify following reasonable academic remediation basic reading and arithmetic skills as well as specific abilities commonly developed in on-the-job or brief skills training (both on-the-job training and other skill development programs) encompasses the following occupations. These positions have been rated as sedentary positions by the Department Of Labor. The Injured worker could perform the position of dispatcher, radio; production clerk; personnel scheduler; scheduler, main-tenance; traffic clerk; insurance clerk; quality control inspector; credit clerk. Dr. Hoover finds that remediation for this Injured worker would likely be short with minimal on-the-job training in view of his formal education beyond the 8th grade and relevant past work experiences.
This Staff Hearing Officer therefore finds based upon all of the above residual functional capacities of Dr. Cunningham and Dr. Tosi, as well as the employment assessment and considering the vocational factors from Dr. Hoover, the Injured Worker is capable of performing sustained renumerative [sic] employment. As a result[,] the Injured worker's IC-2 application filed on 11/14/2002 is hereby DENIED.
 {¶ 17} 9. On August 25, 2003, relator, Luke M. Miler, filed this mandamus action.
Conclusions of Law:
 {¶ 18} Two issues are presented: (1) whether the medical reports of Dr. Cunningham are internally inconsistent such that they cannot constitute some evidence upon which the commission can rely, and (2) whether the Hoover employability assessment report must be eliminated from evidentiary consideration because Hoover constructed an "Adjusted Worker Trait Profile" based on relator's pre-injury work history and in the absence of any post-injury testing.
 {¶ 19} The magistrate finds: (1) the medical reports of Dr. Cunningham are not internally inconsistent, and (2) Dr. Hoover's report need not be excluded from evidentiary consideration. Accordingly, as more fully explained below, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
Turning to the first issue, Ohio Adm. Code 4121-3-34(B)(2)(c) states:
"Medium work" means exerting twenty to fifty pounds of force occasionally, and/or ten to twenty-five pounds of force frequently, and/or greater then negligible up to ten pounds of force constantly to move objects. Physical demand re-quirements are in excess of those for light work.
 {¶ 20} According to relator, Dr. Cunningham produced an internally inconsistent report when he crossed out the word "fifty" and substituted "30" in the definition of medium work. Relator cites to State ex rel. Lopez v. Indus. Comm. (1994),69 Ohio St.3d 445, a case in which the court held that the report of Dr. Katz was so internally inconsistent that it could not constitute some evidence supporting the commission's decision.
 {¶ 21} Relator's contention lacks merit. While "medium work" by definition means exerting 20 to 50 pounds of force occasionally, Dr. Cunningham found during his examination that relator should not lift over 30 pounds. In his narrative report, Dr. Cunningham specifically notes that the 30 pound lifting restriction permits relator to perform "some medium work." Dr. Cunningham is correct. If relator can exert no more than 30 pounds as Dr. Cunningham determined, then relator can perform some but not all types of medium work.
 {¶ 22} In short, Dr. Cunningham's reports are not internally consistent.
 {¶ 23} Turning to the second issue, the commission's employability assessment manual instructs the employability assessor as follows:
4. Tested Aptitudes and Academic Abilities (USDOL coded)
This section allows for consideration and incorporation (if warranted) of occupationally related test data which is provided in previous work or psychological evaluations.
Always cite the source of any data which is used here. If the test results have not already been USDOL coded you will need to do this using professional resources including the RevisedHandbook for Analyzing Jobs and other manuals.
This section is not to be used for reporting data or opinions from medical and psychological/psychiatric reports which are considered in Section II, Employability Opinions. If no test data is available, note that fact in this section.
5. Adjusted Worker Trait Profile
This section asks for a summary, coded profile of residual capacities of all relevant types. This section should address GED, Aptitudes, and Temperaments.
This section reflects only data obtained from educational history, work history and any vocational testing. It will not reflect any medical or psychological opinions which are addressed in Section II (Employability Opinions).
Data presented here should reflect your judgement in generating a profile of residual capacities which fairly depicts claimant capacities as demonstrated in work and educational history and as described in reports of testing. This will generally be a compressed view of the work history reflective of the highest levels of functioning. Adjustments would be made for education or training, as well as objective test data. Again, this profile excludes physical capacity data from medical reports referenced in Section II. This should be the same profile that you would use (or have used) in any computerized vocational analysis of this claimant.
Temperaments demonstrated in work history are not to be used as limiting factors in any computerized assessment. They are requested because they may provide one basis for understanding a claimant's capacity to adapt to situational job demands.
* * *
6. Rationale For Adjusted Worker Trait Profile
This section asks for a brief narrative explanation of how and why the preceding section may present the claimant's capacities as being different from those which would have been presented if the trait profile had been based on work history alone. What data, from what sources, has been utilized to create the adjusted profile? Do you believe that recent test data or work history is a more reliable measure of current academic abilities, finger dexterity, or intelligence? Why?
In creating this profile, if you have chosen to use some data and not use other data, briefly explain the basis for your professional action. You are encouraged to critically evaluate and select from available data in order to create the most fair and accurate Worker Trait Profile.
 {¶ 24} On March 3, 2003, when Dr. Hoover issued his employability assessment report at the commission's request, Dr. MacGuffie had not yet tested relator nor issued a report. Thus, Dr. Hoover was correct in noting that there was no academic achievement test data available in the claimant's file.
 {¶ 25} Moreover, the commission's employability assessment manual does not require the commission's employability assessor to conduct testing or to rely upon the testing of the claimant's vocational expert if the claimant has chosen to provide testing results to the commission.
 {¶ 26} Dr. Hoover followed the instructions set forth in the commission's employability assessment manual. He was not required to conduct so-called post-injury testing, as relator asserts here.
 {¶ 27} In short, Dr. Hoover's report is some evidence upon which the commission can and did rely.
 {¶ 28} The magistrate further notes that relator also challenges the commission's determination, based upon State exrel. Bowling v. Natl. Can Corp. (1996), 77 Ohio St.3d 148, that he is not entitled to PTD compensation because he did not seek additional rehabilitation after an unsuccessful attempt in the fall of 1999.
 {¶ 29} Because relator here unsuccessfully challenges the commission's alternative basis for denial of PTD compensation, this court need not address relator's challenge to that portion of the order addressing rehabilitation efforts or lack thereof.
 {¶ 30} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/ Kenneth W. Macke
KENNETH W. MACKE MAGISTRATE